[Cite as *State v. Buchanan*, 2014-Ohio-3282.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | | |

| STATE OF OHIO | | C.A. No. 13CA0041-M |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| SARAH B. BUCHANAN | | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | | CASE No. 12CR0198 |

DECISION AND JOURNAL ENTRY

Dated: July 28, 2014

BELFANCE, Presiding Judge.

{¶1} Defendant-Appellant Sarah B. Buchanan appeals from the judgment of the Medina County Court of Common Pleas. For the reasons set forth below, we affirm.

I.

{¶2} In the early morning hours of March 18, 2012, Ms. Buchanan drove to the scene of a traffic stop in Wadsworth with another individual to see if she could reclaim the vehicle involved in the stop, which was registered to her mother. She parked the vehicle a short distance from the scene of the stop. As she approached the scene, she encountered Trooper Harley Steppenbacker of the Ohio State Highway Patrol and asked him if she could retrieve the stopped vehicle. Based upon the surrounding circumstances, Trooper Steppenbacker became suspicious that Ms. Buchanan might be linked to the methamphetamine found in the vehicle involved in the stop or to other criminal activity. While still investigating the situation, Trooper Steppenbacker walked Ms. Buchanan back to the vehicle she had arrived in and had a drug dog present at the

scene sniff her vehicle. The dog alerted to several areas of the vehicle. Consequently, a search of the vehicle was conducted, and drug-related items were found in that vehicle.

{¶3} Ms. Buchanan was initially indicted in April 2012 on one count of illegal assembly or possession of chemicals for the manufacture of methamphetamine in violation of R.C. 2925.041(A). Two additional counts were added in October 2012: one for aggravated possession of drugs (methamphetamine) in violation of R.C. 2925.11(A)(C)(1)(a) and one for possession of cocaine in violation of R.C. 2925(A)(C)(4)(a). Ms. Buchanan filed a motion to suppress, and the matter proceeded to a hearing. The trial court ultimately denied Ms. Buchanan's motion, concluding that, while Trooper Steppenbacker had seized Ms. Buchanan, he had reasonable, articulable suspicion to believe that she was engaged in criminal activity and, thus, was justified in detaining her at the time the drug dog walked around the vehicle.

{¶4} Ms. Buchanan then entered a no contest plea and was sentenced to an aggregate term of 18 months in prison. She has appealed, raising a single assignment of error for our review.

II.

ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN NOT GRANTING SARAH B. BUCHANAN[']S MOTION TO SUPPRESS ON THE BASIS THAT A SEARCH WAS IMPROPERLY CONDUCTED ON HER VEHICLE RESULTING IN HER CONVICTION.

{¶5} Ms. Buchanan asserts in her sole assignment of error that the trial court erred in denying her motion to suppress because Trooper Steppenbacker did not have the reasonable suspicion necessary to detain her.

{¶6} The Supreme Court of Ohio has held that

[a]ppellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

(Internal citations omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.

{¶7} The Fourth Amendment to the United States Constitution and Section 14, Article 1 of the Ohio Constitution prohibit unreasonable searches and seizures. *State v. Kinney*, 83 Ohio St.3d 85, 87 (1998). "Searches and seizures without a warrant are per se unreasonable except in a few well-defined and carefully circumscribed instances." (Emphasis, internal quotations, and citation omitted.) *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 98.

{¶8} "A seizure occurs when an individual is detained under circumstances in which a reasonable person would not feel free to leave the scene[. Therefore,] both an investigatory stop and an arrest constitute 'seizures' within the meaning of the Fourth Amendment." *State v. Snyder*, 9th Dist. Medina No. 06CA0018-M, 2006-Ohio-6911, ¶ 13. Likewise, the Supreme Court has noted that "not all seizures of the person must be justified by probable cause to arrest for a crime." *Florida v. Royer*, 460 U.S. 491, 498 (1983). "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981). "[R]easonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). Reasonable suspicion requires that the officer "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

{¶9}  Likewise, "some brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests that strong countervailing governmental interests will justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime." *United States v. Place,* 462 U.S. 696, 706 (1983).  In considering whether there is reasonable articulable suspicion, we consider the totality of the circumstances. *See State v. Walker*, 9th Dist. Summit No. 25744, 2011-Ohio-5779, ¶ 12.

{¶10}  The only two witnesses to testify at the suppression hearing were Trooper Steppenbacker and Officer Phillip Cantora of the Wadsworth Police Department.  In addition to having other duties, Officer Cantora is a canine handler.

{¶11}  Around 1:30 a.m. on March 18, 2012, Trooper Hasler of the Ohio State Highway Patrol initiated a traffic stop on a vehicle in Wadsworth.  After Trooper Hasler noticed a syringe full of fluid near the driver's (Shaun Roland's) leg, Trooper Hasler called for assistance, and Trooper Steppenbacker came to the scene.  Trooper Steppenbacker spoke briefly to Mr. Roland at which point he indicated that the syringe contained methamphetamine.  After speaking with Mr. Roland, Trooper Steppenbacker noticed that the passenger Sharice Lemon was speaking "frantically" on her cell phone.  Trooper Steppenbacker asked her to hang up the phone and step out of the vehicle.  He then placed Ms. Lemon in the rear of the patrol car, at which time she admitted to having methamphetamine on her person.  Trooper Steppenbacker then called a female officer to the scene to retrieve the methamphetamine from Ms. Lemon's person.

{¶12}  Trooper Steppenbacker conducted a search of the vehicle and found "coffee filters, what appeared to be muriatic acid * * *, a bunch of tubing jars, [and] tubing bottles[,]" items which in Trooper Steppenbacker's experience were used in the production of

methamphetamine. At this point, the drug task force was contacted due to the hazardous nature of some of the substances used in the manufacture of methamphetamine.

{¶13} Trooper Steppenbacker stated that a car pulled up close to the traffic stop up in front of them off to the right in a parking lot. At that time, there were four police cruisers parked behind the vehicle Mr. Roland was driving. When he observed the vehicle, Trooper Steppenbacker called Wadsworth police for backup. The driver of that vehicle, Ms. Buchanan, approached the scene, told Trooper Steppenbacker that the vehicle involved in the stop was hers, and asked if she could take it. Trooper Steppenbacker described Ms. Buchanan as "fairly frantic about getting the vehicle." He also indicated that she "appeared * * * to be extremely nervous * * * [and] somewhat shaking. [He] noticed that she had a lot of scratches around her face and neck and was like picking at herself which is an indication that someone is using methamphetamine." Trooper Steppenbacker explained that people who use methamphetamine get what he described as the "crawlies where they think they have bugs crawling on them so they pick at themselves."

{¶14} Trooper Steppenbacker learned that, while the vehicle was actually registered to Ms. Buchanan's mother, Ms. Buchanan had loaned the vehicle to Mr. Roland. At this point in time, Trooper Hasler relayed to Trooper Steppenbacker that "Mr. Roland had told him that [Ms. Buchanan] should be on the world's dumbest criminals for coming on a scene where she knows there is a meth lab in the car." Trooper Steppenbacker indicated that he then suspected Ms. Buchanan was involved in criminal activity. Trooper Steppenbacker had Ms. Buchanan produce her license and was able to quickly determine that she did not have any outstanding warrants, although he was not certain whether he found that information out before or after the dog sniff. However, he testified that it took much longer to obtain other information relative to Ms.

Buchanan's criminal history. From the transcript, it appears that he did not receive that information prior to the dog sniff of the vehicle. Trooper Steppenbacker made the decision to go back to Ms. Buchanan's vehicle because there was another occupant in the vehicle. He testified that, because Officer Cantora and his canine, Ozzie, were either on scene or almost at the scene, he requested that Officer Cantora walk Ozzie around the vehicle that Ms. Buchanan had brought to the scene. Trooper Steppenbacker testified that, at the point he started walking Ms. Buchanan back to her vehicle, she was not free to leave because "[t]here was an ongoing investigation." Trooper Steppenbacker additionally testified that, despite denying any knowledge of anything related to the traffic stop and appearing relaxed and well-dressed, the man who accompanied Ms. Buchanan also was not free to leave due to the ongoing nature of the investigation.

{¶15} Officer Cantora testified that he was called to the scene "for mutual aide to assist the state highway patrol" and was on the scene when Ms. Buchanan initially approached Trooper Steppenbacker. Officer Cantora indicated that, because the driver of the vehicle originally stopped (Mr. Roland) admitted to having drugs, Officer Cantora's services were not needed for that vehicle. Officer Cantora stated, that "[a]bout that time, a second vehicle arrived and there was some discussion about that vehicle and then the driver of that vehicle [(Ms. Buchanan)] came up, talked to a trooper and then the trooper asked [him] to deploy [his] canine on that vehicle." Officer Cantora estimated that less than five minutes elapsed from when he arrived to when he approached the vehicle to walk Ozzie around it. He also indicated that it took him approximately between five to ten seconds to walk from the scene of the traffic stop to the location where Ms. Buchanan's vehicle was parked. At the time Officer Cantora approached the car, Ms. Buchanan and a passenger she brought to the scene to keep her company were already inside the vehicle. Officer Cantora testified that while Ms. Buchanan appeared very nervous, the

passenger appeared very calm and relaxed. Officer Cantora was also struck by Ms. Buchanan's appearance. He testified that he was "very concerned for [her] wellbeing * * *." He noted that she "was very thin, [had] sunken cheeks[, and] marks on her face." Officer Cantora also described her as having the "[c]rawlies[.]" He testified that, in his training and experience those characteristics were all indicative of "an individual who is heavily [into] methamphetamine." Officer Cantora walked Ozzie around the car and he alerted to three different areas. Trooper Steppenbacker estimated that approximately ten minutes passed between the time Ms. Buchanan first arrived on the scene and the time Ozzie alerted. Thereafter, a search was conducted of the vehicle, and the items that resulted in Ms. Buchanan's charges were found in the vehicle.

{¶16} All of Ms. Buchanan's arguments center upon her assertion that officers lacked reasonable articulable suspicion to detain her. In light of the foregoing, we cannot conclude the trial court erred in concluding that Trooper Steppenbacker possessed reasonable suspicion such that he was permitted to detain her while investigating her potential involvement in the criminal activity just discovered upon stopping Mr. Roland. We note that the police involved in this case were presented with an unusual situation: while the officers were investigating a routine traffic stop in the early hours of the morning, a woman, Ms. Buchanan, just showed up on the scene and essentially inserted herself into the ongoing investigation. Trooper Steppenbacker had observed Ms. Lemon who, herself possessed drugs, talking frantically on her cell phone. Shortly thereafter, Ms. Buchanan arrived at the scene, claimed ownership of the stopped vehicle that contained a meth lab, and sought to retrieve the vehicle. Moreover, Trooper Steppenbacker discovered that Ms. Buchanan was at least acquainted with Mr. Roland, the driver of the vehicle containing the methamphetamine and related materials, as she told the trooper that she loaned the car to Mr. Roland. Further, Mr. Roland's comment that Ms. Buchanan "should be on the world's

dumbest criminals for coming on a scene where she knows there is a meth lab in the car[]" was relayed to Trooper Steppenbacker prior to detaining Ms. Buchanan. Thus, there was evidence suggesting that Ms. Buchanan had knowledge that the vehicle she loaned Mr. Roland had or would have methamphetamine-related materials in it. Additionally, both officers noticed Ms. Buchanan's striking appearance and nervous behavior which, based upon their training and experience, they both associated with methamphetamine use.

{¶17} Given all of the foregoing circumstances, Trooper Steppenbacker possessed reasonable, articulable suspicion that Ms. Buchanan was engaged in criminal activity, i.e. that she was involved in the manufacture and/or use of methamphetamines. Further, given the unexpected nature of Ms. Buchanan's arrival on the scene of a not-yet-completed traffic stop, her nervous behavior, and her possible association with methamphetamine-related materials found in her mother's car, we cannot say that it was unreasonable under the circumstances of this case for Trooper Steppenbacker to walk Ms. Buchanan to her car so that the integrity and security of the scene could be maintained and so that Trooper Steppenbacker could determine the identity of the person sitting in the vehicle. The police already had two individuals in their custody and had called the drug task force to the scene in light of the chemicals discovered in the vehicle. From the transcript it can be reasonably deduced that the scene was busy, and there is little doubt that Ms. Buchanan's unexpected appearance on the scene caused further disruption and a need to investigate. In addition, it is evident that there were significant concerns for the safety of the officers and of the people involved in the stop due to the presence of dangerous chemicals associated with manufacturing methamphetamine and the inherent dangers associated with dealing with drug-related crime. Accordingly, under the circumstances, walking Ms. Buchanan to her car was reasonable, particularly when there was an unknown individual waiting in that

vehicle. Thus, to the extent that Ms. Buchanan's argument is founded upon the notion that moving her to her vehicle was impermissible due to the absence of reasonable articulable suspicion, we do not find merit in that argument.

{¶18} Likewise, we note that this is not a situation in which police continued to detain an individual while awaiting the arrival of a drug dog. In the instant matter, at the point in time when Trooper Steppenbacker first possessed reasonable suspicion the drug dog was either just arriving at the scene or was already at the scene. Ms. Buchanan does not challenge the duration of her detention or assert that there was any delay in walking the drug dog around the vehicle. Nor does Ms. Buchanan assert that the investigation was completed or that the reasonable suspicion possessed by police had been dispelled. In fact, it is clear from the record that Trooper Steppenbacker's investigation was ongoing when he walked Ms. Buchanan back to her car. Instead, the foundation of her argument is that there was no reasonable articulable suspicion present to detain her at all, for any length of time.

{¶19} Accordingly, in light of the record before us and the limited argument made on appeal, we conclude that detention of Ms. Buchanan when the drug dog walked around the vehicle occurred at a point in time when police investigation of Ms. Buchanan was underway based upon reasonable suspicion that Ms. Buchanan was involved in criminal activity. Thus, we do not find merit in the limited argument before us.

{¶20} We overrule Ms. Buchanan's sole assignment of error.

III.

{¶21} In light of the foregoing, we affirm the judgment of the Medina County Court of Common Pleas.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

EVE V. BELFANCE
FOR THE COURT

HENSAL, J.
CONCURS.

CARR, J.
CONCURRING IN JUDGMENT ONLY.

{¶22} I concur in the majority's opinion with the exception of the discussion in paragraph 18.

APPEARANCES:

JOHN M. CELEBREZZE, Attorney at Law, for Appellant.

DEAN HOLMAN, Prosecuting Attorney, and MATTHEW A. KERN, Assistant Prosecuting Attorney, for Appellee.